# Exhibit A

NF

**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**NOVEMBER 19, 2007**
MICHAEL W. DOBBINS
CLERK. U.S. DISTRICT COURT

| | | |
|---|---|---|
| **CHARLOTTE HORTON**, as guardian of the estate of Anna R. Richardson, adjudicated disable person, | ) ) ) ) | |
| Plaintiff, | ) ) | **07 C 6530** |
| v. | ) ) | |
| **COUNTRY MORTGAGE SERVICES, INC.**; an Illinois corporation; **FREMONT INVESTMENT & LOAN**, a California corporation; and, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**, a Delaware corporation. | ) ) ) ) ) ) ) | JUDGE LINDBERG MAGISTRATE JUDGE NOLAN |
| Defendants. | | |

## COMPLAINT

Now Comes CHARLOTTE HORTON, as guardian of the estate of Anna R.
Richardson, by and through her attorney Lloyd Brooks, to complain against the
defendants as follows:

### Nature of the Action

1.      This action is brought by the guardian of Anna R. Richardson seeking
rescission of a mortgage loan made to Anna while she suffered from dementia.  The
loan officer closed the loan in Anna's home however failed to leave her with any
documentation of the loan including notices and disclosures required to be provided to
Anna by the federal Truth In Lending Act. The violation of TILA gave rise to a statutory
right for Anna to rescind the subject loan.  Additionally, the mortgage broker and lender
engaged in a kickback scheme where the mortgage broker was given a referral fee for
arranging the loan to Anna in violation of the Real Estate Settlement Procedure Act.

## Parties

2.     **Charlotte Horton** is the plaintiff in her capacity as guardian of the estate of Anna R. Richardson.  Horton was appointed as guardian for Anna R. Richardson in an action styled In Re Estate of Anna R. Richardson, 06 P 527 in the Circuit Court of Cook County, Probate Division.

3.     **Country Mortgage Services, Inc.**, ("Country Mortgage") is an Illinois corporation and is the business or procuring mortgage for its customers as a mortgage broker.  Country Mortgage arranged for the mortgage that is the subject of this action.

4.     **Fremont Investment & Loan Company** ("Fremont") is a California corporation with its principal offices located in Brea, California and does business in Illinois.  Fremont originates loans to consumers to be secured by the consumer's principal residence by a mortgage.  Fremont has originated more than 25 such transactions in the calendar year preceding the subject loan.

5.     **Mortgage Electronic Registration Systems, Inc.** ("MERS") is a Delaware corporation with its principal place of business located in Vienna, Virgina. MERS acts as the nominee and holder of mortgages on behalf of mortgage lenders and other holders of monetary obligations secured by real estate, including real estate located in Illinois and within this judicial district.  MERS, as the nominee of Fremont, is the holder of the Mortgage that is the subject of the present action.

## Jurisdiction and Venue

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 as this action arises under the laws of the United States.  This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1332 as they

7.    This Court has jurisdiction over the defendants who are all doing business in this State and have availed themselves of this State's benefits and protections.

8.    Venue is proper in this Court as defendants reside within this judicial district and a substantial portion of the events giving rise to this action occurred within this judicial district.

## Facts Common To Each Cause Of Action

9.    Anna Richardson is an elderly woman born October 2, 1912.  Richardson is the owner of a two unit building located at 1647 S. Central Park Avenue in Chicago, Illinois and has been for nearly 50 years.

10.    In March of 2003 Anna refinanced her mortgage on the property by taking out a loan with Bank One in the amount of $25,800.  The loan was serviced by Chase Home Finance.

11.    Anna developed dementia beginning by at least 2004 and it developed into a form of severe dementia before October of 2005.

12.    Due to Anna's failing medical condition, Horton became Anna's power of attorney and handled all of her financial affairs including the payment of her monthly mortgage payments to Chase.

13.    In October of 2005 a general contractor named JD Homes, Inc. contacted Anna, without Horton's consent or knowledge, and convinced her to allow the company to perform some work on the property.

14.    The general contractor informed Anna that the company would arrange for financing of the work.  Shortly thereafter Anna was contacted by a loan officer employed by CMS.

15.    On October 24, 2005 the loan officer visited Anna at her home and brought to her numerous documents in connection with closing the loan that was to pay of the home remodeling.

16.    The loan officer did not explain any of the documents to Anna, nor could Anna read or understand the documents she was given.

17.    The loan officer instructed Anna to sign the documents and Anna complied.

18.    After the Anna completed signing the documents the loan officer left with them and did not leave any copies for Anna's records.

19.    On information and belief, the contractors were given two checks from the proceeds of the loan totaling over $100,000 by the title company or the loan officer.

20.    The contractor never returned to Anna's home to do any work.

21.    Subsequently, Chase sent notification to Horton that its loan had been paid off. Horton, unaware of the recent events, contacted Chase to inquire about the source of the payoff funds.

22.    Horton became informed that a new loan for $150,000 had been secured by Anna's home.

23.    Horton inquired of Anna regarding the loan, and Anna denied ever taking out a loan. Anna's failure to remember taking out a loan was due to her unstable mental capacity arising from her dementia.

24.    Charlotte contacted an attorney who assisted her in obtaining information regarding the subject loan. On or about August 14, 2007 counsel for CMS forwarded certain documents related to the loan to counsel for Horton. Some of the

documentation obtained included the following the Settlement Statement for the loan indicating the accounting for the loan proceeds and that the lender was Fremont. A copy of the Settlement Statement is attached at Exhibit A.

25.    The Settlement Statement reveals that the principal loan amount was $150,000; the loan proceeds were $104,388.38; and the total fees paid to CMS were $5,560.50.

26.    Charlotte has been unable to locate or contact the general contractors who received the proceeds for the subject loan and no work has ever been done on Anna's home.

**Count I**
**Violation of Truth In Lending Act**
**(Against Fremont and MERS)**

27.    Plaintiff realleges paragraphs 1 to 26 as though they were fully realleged herein.

28.    The loan made to Anna was for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes and to pay for remodeling of the home.

29.    At the closing of the loan Anna was requested to sign a Mortgage to convey a security interest in her home to MERS, as the nominee of Fremont.

30.    Because this transaction was secured by Anna's home and was not entered into for purposes of its initial purchase or construction, the loan was made subject to Anna's rescission rights under the Truth In Lending Act, 15 U.S.C. §1635, and implementing Federal Reserve Board Regulation Z, 12 C.F.R. Part 226.

31.    Regulation Z reads in pertinent part:

§226.23

(a) *Consumer's right to rescind.*

(1)    In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.

(2)    To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

(3)    The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures, whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act.

(b)*Notice of right to rescind*:

(1)    In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered by electronic communication as provided in section 226.36(b)). The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(i)    The retention or acquisition of a security interest in the consumer's principal dwelling.

(ii)    The consumer's right to rescind the transaction.

(iii)    How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(iv)    The effects of rescission, as described in paragraph (d) of this section.

(v)    The date the rescission period expires.

(d) *Effects of rescission.*

(1)    When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

(2)    Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

(3)    If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph (d)(2) of this section. When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence.  Tender of money must be made at the creditor's designated place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.

32. TILA provides in pertinent part:

12 U.S.C.§1640

> Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title, or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—
>
> (1) any actual damage sustained by such person as a result of the failure;
>
> (2)(A) (iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2,000;
>
> (3) in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court.

33.　Anna was not provided with any copies of a Notice of Right to Cancel or a Truth In Lending Statement in violation of her TILA rights pursuant to 15 U.S.C. §1635 and Regulation Z, §226.23(b).

34.　The failure to provide Anna with proper notice of her right to cancel or a Truth In Lending Disclosure Statement gives rise to an extended right to rescind the subject transaction.

35.　An election was made by Charlotte, on behalf of Anna, to rescind the subject loan. See Exhibit B.

36.　Since the time of the election to rescind neither Fremont nor MERS has contacted Charlotte or her counsel concerning the rescission of the loan.

WHEREFORE CHARLOTTE HORTON, on behalf of Anna R. Richardson, respectfully request that the Court enter judgment in Anna's favor and against FREMONT INVESTMENT & LOAN COMPANY and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. for a judgment, capable of recordation in public records, voiding the subject mortgage; statutory damages for the underlying failure to provide Anna with the proper disclosures and notice of her right to cancel the transaction; statutory damages for the failure to honor the election to rescind the loan;

an order requiring deletion of all adverse credit information relating to the loan; an award of his attorney's fees and costs of this action; and, such other relief as this Court deems just and appropriate.

## Count II
### Rescission of Note and Mortgage
### (Against Fremont, MERS)

37.     Plaintiff realleges paragraphs 1 to 26 as though they were fully realleged herein.

38.     At the time that Anna executed the documents provided to her by the loan officer she was diagnosed with dementia.

39.     Dementia is an acquired loss of cognitive function that affects language, attention, memory, personality and abstract reasoning.

40.     Due to Anna's dementia she was unable to form the requisite state of mind to enter into an agreement with Fremont to borrow any funds.

41.     Anna is not responsible to pay to either Fremont, MERS, or their successors any amounts that were not received by her, including the amounts that the contractor received and did not use to perform any work on her behalf.

42.     Anna has already tendered sufficient funds to Fremont to extinguish the amount of debt that she may owe under the subject loan.

WHEREFORE Plaintiff respectfully requests this Court grant the relief of declaration that the loan transaction with Fremont Investment & Loan Company is void; the neither Fremont nor Mortgage Electronic Registration Systems, Inc. have any further interest in the subject property resulting from the mortgage conveyed to MERS; and award Anna any other relief this Court may find just and reasonable.

**Count III**
**Violation of RESPA's Antikickback Provisions**
**(Against Fremont and Country Mortgage)**

43.     Plaintiff realleges paragraphs 1 to 26 as though they were fully realleged herein.

44.     Fremont's operations are made profitable through the receipt of fees and interest payments on loans that it originates as well as the selling of its loans on the secondary mortgage market.

45.     When selling loans on the secondary market, Fremont is able to command a higher selling price for loans with higher stated interest rates and other terms that are lender friendly.

46.     Fremont originates its loans by associating with mortgage brokers. Fremont provides mortgage brokers with "rate sheets" or similar documents that provide the mortgage broker with information regarding Fremont's loan programs including the interest rates it would charge qualified borrowers called "par rates".

47.     In an effort to increase its profits through higher interest payments from its borrowers and higher selling prices for the loans it sells, Fremont encourages mortgage brokers to arrange for loans to borrowers with higher than "par rate" interest rates.

48.     Fremont encourages the mortgage brokers to arrange for these higher than "par rate" loans by offering the mortgage broker a portion of the up charged interest rate called a "yield spread premium." The higher the up charged interest rate the higher the yield spread premium paid to the mortgage broker.

49.     CMS is a mortgage broker.  As a mortgage broker, CMS arranges for loans for its customers by contacting direct lenders, such as Fremont, to originate loans to CMS's customers.

50.    CMS makes a profit by charging fees directly to its customers such as loan application fees, underwriting fees, loan origination fees, etc.

51.    CMS also enters into agreements with the direct lenders, including Fremont, whereby CMS accepts yield spread premiums on each loan made and other bonuses such as volume based compensation, which are paid based upon the volume of loans arranged by CMS to the lender during a period of time.

52.    Aware that no reasonable borrower would agree to pay a higher interest rate, without any benefit in return, CMS does not reveal to its customers that they are paying higher than "par rate" interest rates.  CMS does not reveal to its customers that they qualify for lower interest rates.  CMS does not reveal that they are being paid a yield spread premium or why they are being paid a yield spread premium.

53.    Fremont is aware that its mortgage brokers, including CMS, do not reveal the nature or purpose of the yield spread premium that the mortgage broker is receiving and that mortgage brokers, including CMS, induce borrowers to enter into loan agreements with Fremont by using fraud and deceit, including misrepresentations and concealment of material facts regarding the existence, nature, and purpose of the yield spread premium and the increased interest rate the borrower is paying.

54.    CMS procured a mortgage loan for Anna totaling $150,000.

55.    CMS was paid a broker fee in the amount of $2,780.00, a processing fee of $495.00, and a yield spread premium in the amount of $2,250.00, a credit report fee of $10.50, and a courier fee of $25.00.

56.    Unbeknownst to Anna, Fremont and CMS had previously entered into the above described scheme whereby CMS would refer uncharged interest rate loan

business to Fremont in exchange for Fremont providing CMS with a yield spread premium for such referrals.

57.   CMS in fact referred the loan application for Anna to Fremont and CMS received a yield spread premium of $2,250.00 from Fremont in addition to the $3,310.50 in loan fees, in connection with the subject transaction.

58.   As described above, the payment of the yield spread premium is a kickback from Fremont to CMS for the referral of business and also for the agreement to increase the interest rate on the borrower above that which the borrower might otherwise qualify for.

59.   CMS and Fremont did not disclose that Anna qualified for an interest rate lower than the one she was charged for the subject loans.

60.   CMS and Fremont did not disclose to Anna that CMS was going to receive additional compensation outside of closing by having Plaintiff agree to pay a higher than necessary interest rate for the loans.

61.   CMS and Fremont did not disclose to Anna that they had entered into a scheme involving the exchange of loan referrals for the payment of yield spread premiums.

62.   The Department of Housing and Urban Development (HUD) has issued policy statements providing guidelines for compensable services provided by mortgage brokers in connection with the origination of a mortgage loan.  Those compensable services include:

(a)   Taking information from the borrower and filling out the application;
(b)   Analyzing the prospective borrower's income and debt and prequalifying the prospective borrower to determine the maximum mortgage that the prospective borrower can afford;

(c)     Educating the prospective borrower in the home buying and financing process, advising the borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments could vary under each product;

(d)     Collecting financial information (tax returns, bank statements) and other related documents that are part of the application process;

(e)     Initiating/ordering VOEs (verifications of employment) and VODs (verifications of deposit);

(f)     Initiating/ordering requests for mortgage and other loan verifications;

(g)     Initiating/ordering appraisals;

(h)     Initiating/ordering inspections or engineering reports;

(i)     Providing disclosures (truth in lending, good faith estimate, others) to the borrower;

(j)     Assisting the borrower in understanding and clearing credit problems;

(k)     Maintaining regular contact with the borrower, realtors, lender, between application and closing to appraise them of the status of the application and gather any additional information as needed;

(l)     Ordering legal documents;

(m)     Determining whether the property was located in a flood zone or ordering such service; and

(n)     Participating in the loan closing.

63.     In connection with Anna's loan CMS did not perform any of the HUD recognized services, other than the loan officer participated in the closing.

64.     To the extent that CMS provided any compensable service, the market value for those services were not worth in excess of $5,560.50, which CMS received in connection with Anna's loan.

65.     The amount of total compensation paid to CMS did not reasonably relate to the value of the services provided by CMS and is in excess of what other mortgage brokers in a similar transaction would be paid.

66.     The Real Estate Settlement Practices Act provides in pertinent part:

No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person. 12 U.S.C. 2607(a).

67.    Fremont agreed to pay and CMS agreed to accept a fee that was in excess of any amount CMS reasonably should receive for its services

68.    The amount Fremont paid was to compensate CMS for referring the loan.

69.    Such a payment is in violation of RESPA's bar against referral fees.

70.    Section 2607(d)(2) of RESPA reads in pertinent part:

Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

71.    In addition Section 2607(d)(5) of RESPA allows a successful plaintiff the recovery of their reasonable attorney's fees and litigation costs.

WHEREFORE CHARLOTTE HORTON, on behalf of Anna R. Richardson, request this Court enter judgment in Anna's favor and against FREMONT INVESTMENT & LOAN COMPANY and COUNTRY MORTGAGE SERVICES, INC. in an amount of three times the unlawful payment or $16,681.50, award her attorney's fees and costs of litigation, and other relief this Court finds reasonable and just.

### Count IV
### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act
### (Against Fremont and Country Mortgage)

72.    Plaintiff realleges paragraphs 1 to 26 and  44 - 65 as though they were fully realleged herein.

73.    The Illinois Consumer Fraud and Deceptive Business Practices Act  reads in pertinent part:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or

the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

74. CMS:

    a) misrepresented to Anna the amounts of fees they would be charged in connection with the loans;

    b) failed to disclose to Anna that it had entered into a scheme with Fremont, whereby CMS would obtain additional compensation for referring loan business to Fremont;

    c) failed to disclose to Anna that they were paying a higher than market rate interest rate on the loans;

    d) failed to disclose to Anna that it was going to obtain a higher profit from the loans due to the increased interest rate; and

    e) charged a fee in connection with the loans well in excess of the reasonable market rate for the services they provided.

75. Fremont:

    a) entered into a scheme with CMS to refer Anna' loan;

    b) paid CMS a kickback in exchange for its loan referral;

    c) failed to disclose to Anna its participation in the scheme; and,

    d) failed to disclose to Anna that they qualified for a lower interest rate.

76.    CMS and Fremont's conduct was unfair and deceptive to Anna and used in the course of their trade as a mortgage broker and lender.

77.    CMS and Fremont acted with the intent that Anna rely upon their conduct in executing documents at the October 24, 2005 closing.

78.    CMS and Fremont's practices have caused Anna substantial damages including the higher interest payments on the subject loans than would otherwise be required.

WHEREFORE CHARLOTTE HORTON, on behalf of Anna R. Richardson, prays upon this Court to enter a judgment in Anna's favor and against FREMONT

INVESTMENT & LOAN COMPANY and COUNTRY MORTGAGE SERVICES, INC. and award her actual damages in an amount to be proven at trial, enjoin the defendants requiring them to disgorge any and all proceeds and profits received in the subject transaction, her attorney's fees, costs to bring this action, and other further relief as the Court deems equitable and proper.

Respectfully Submitted,

/S/ Lloyd Brooks

_____
Attorney for Plaintiff

State Bar NO. 6271994
Lloyd Brooks
The Brooks Law Firm
15008 Woodlawn Avenue
Dolton, Illinois 60419
(708) 841-8000 Telephone
(70*) 841-8080 Facsimile
E-mail: lloyd.brooks@thebrooksfirm.com
**Attorney for Plaintiff**

10/24/05 7.38 AM

OMB No 2502-0265

| A. U.S. Department of Housing and Urban Development | B. Type of Loan | | |
|---|---|---|---|
| | 1. [ ] FHA | 2. [ ] FMHA | 3. [X] Conv. Unins |
| | 4. [ ] VA | 5. [ ] Conv. Ins. | |
| | 6. File Number | 7. Loan Number | |
| | 40656 | 925000182867 | |

**Settlement Statement**

8. Mortgage Ins. Case No.

C. Note:   This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked ("POC") were paid outside the closing; they are shown here for information purposes and are not included in the totals

D. Name of Borrower:   ANNA R. RICHARDSON

E. Name of Seller:

F. Name of Lender:   FREEMONT INVESTMENTS, 1411 OPUS PLACE  SUITE 600, DOWNERS GROVE, IL 60515

**07 C 6530**

G. Property Location:   NEWKIRK'S SUBDIVISION

1647 SOUTH CENTRAL PARK AVENUE, CHICAGO, IL 60623

H. Settlement Agent:   Absolute Title Services, Inc (847) 285-5900

Place of Settlement:   2227 Hammond Drive, Suite B, Schaumburg, IL 60173     TIN:   36-4105088

I. Settlement Date:   10/24/2005

Proration Date:   10/28/2005

**JUDGE LINDBERG**
**MAGISTRATE JUDGE NOLAN**

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100.  Gross amount due from borrower: | | 400.  Gross amount due to seller: | |
| 101.  Contract sales price | | 401.  Contract sales price | |
| 102.  Personal property | | 402.  Personal property | |
| 103.  Settlement charges to borrower (line 1400) | 9,970.48 | 403. | |
| 104.  MTG PO TO NEIGHBORHOOD HOUSING SERVICE | 10,902.90 | 404. | |
| 105.  MTG PO TO CHASE | 24,738.24 | 405. | |
| Adjustments for items paid by seller in advance: | | Adjustments for items paid by seller in advance: | |
| 106.  City/town taxes | | 406.  City/town taxes | |
| 107.  County taxes | | 407.  County taxes | |
| 108.  Assessments | | 408.  Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120.  Gross amount due from borrower: | 45,611.62 | 420.  Gross amount due to seller: | 0.00 |
| 200.  Amounts paid by or in behalf of the borrower: | | 500.  Reduction in amount due to seller: | |
| 201.  Deposit or earnest money | | 501.  Excess deposit (see instructions) | |
| 202.  Principal amount of new loan(s) | 150,000.00 | 502.  Settlement charges to seller (line 1400) | 0.00 |
| 203.  Existing loan(s) taken subject to | | 503.  Existing loan(s) taken subject to | |
| 204. | | 504.  Payoff of first mortgage loan | |
| 205. | | 505.  Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller: | | Adjustments for items unpaid by seller: | |
| 210.  City/town taxes | | 510.  City/town taxes | |
| 211.  County taxes | | 511.  County taxes | |
| 212.  Assessments | | 512.  Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220.  Total paid by/for borrower: | 150,000.00 | 520.  Total reduction in amount due seller: | 0.00 |
| 300.  Cash at settlement from/to borrower: | | 600.  Cash at settlement to/from seller: | |
| 301.  Gross amount due from borrower (line 120) | 45,611.62 | 601.  Gross amount due to seller (line 420) | 0.00 |
| 302.  Less amount paid by/for borrower (line 220) | 150,000.00 | 602.  Less total reduction in amount due seller (line 520) | 0.00 |
| 303.  CASH ( )FROM (X)TO BORROWER | 104,388.38 | 603.  CASH ( )FROM ( )TO SELLER | 0.00 |

SUBSTITUTE FORM 1099 SELLER STATEMENT - The information contained in Blocks E, G, H and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404), 406, 407 and 408-412 (applicable part of buyer's real estate tax reportable to the IRS) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. SELLER INSTRUCTION - If this real estate was your principle residence, file form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return, for other transactions, complete the applicable parts of form 4797, Form 6252 and/or Schedule D (form 1040).

You are required to provide Absolute Title Services, Inc (847) 285-5900 with your correct taxpayer identification number. If you do not provide Absolute Title Services, Inc (847) 285-5900 with your correct taxpayer identification number, you may be subject to civil or criminal penalties.



**Exhibit A**

| | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| 700. | L. Settlement Charges: Total sales/broker commissic ... 10/24/05 7:38 AM | File Number: 40656 | | |
| | Division of commission (line 700) as follows | | | |
| 701. | $ | | | |
| 702. | $ | | | |
| 703. | Commission paid at settlement | | | |
| 704. | | | | |
| 800. | Items payable in connection with loan | | | |
| 801. | Loan origination fee    to   FREEMONT INVESTMENT( 0.596%) | | | |
| 802. | Loan discount | | 894.00 | |
| 803. | Appraisal fee    to   ACTIVE APPRAISALS PLUS, INC | | 450.00 | |
| 804. | Credit report    to   COUNTRY MORTGAGE SERVICES | | 10.50 | |
| 805. | Lender's inspection fee | | | |
| 806. | Mortgage insurance application fee | | | |
| 807. | Assumption fee | | | |
| 808. | BROKER FEE    to   COUNTRY MORTGAGE SERVICES | | 2,780.00 | |
| 809. | TAX SERVICE FEE    to   LANDAMERICA TAX AND FLOOD SERVICES | | 60.00 | |
| 810. | FLOOD CERT FEE    to   LANDAMERICA TAX AND FLOOD SERVICES | | 9.50 | |
| 811. | PROCESSING FEE    to   COUNTRY MORTGAGE SERVICES | | 495.00 | |
| 812. | COURIER FEE    to   COUNTRY MORTGAGE SERVICES | | 25.00 | |
| 813. | YSP PD BY LENDER    to   COUNTRY MORTGAGE SERVICES    POCL 2250.00 | | | |
| 900. | Items required by lender to be paid in advance | | | |
| 901. | Interest from   10/28/2005  to  11/1/2005    at $30.6200/day  for 4 days | | 122.48 | |
| 902. | Mortgage insurance premium for | | | |
| 903. | Hazard insurance premium for    to AMERICAN FAMILY II | | 1,291.00 | |
| 904. | | | | |
| 905. | | | | |
| 1000. | Reserves deposited with lender | | | |
| 1001. | Hazard insurance | | | |
| 1002. | Mortgage insurance | | | |
| 1003. | City property taxes | | | |
| 1004. | County property taxes | | | |
| 1005. | Annual assessments (maint.) | | | |
| 1006. | | | | |
| 1007. | | | | |
| 1008. | | | | |
| 1009. | | | | |
| 1100. | Title charges | | | |
| 1101. | Settlement or closing fee    to   Absolute Title Services, Inc | | 175.00 | |
| 1102. | Abstract or title search | | | |
| 1103. | Title examination | | | |
| 1104. | Title insurance binder | | | |
| 1105. | Document preparation QUIT CLAIM to   STEVE SHAYKIN | | 75.00 | |
| 1106. | Notary fees | | | |
| 1107. | Attorney's fees to | | | |
| | includes above items no.: | | | |
| 1108. | Title insurance    to   Absolute Title Services, inc | | 460.00 | |
| | includes above items no. | | | |
| 1109. | Lender's coverage    $150,000.00    $460.00 | | | |
| 1110. | Owner's coverage | | | |
| 1111. | EPA/COMP ENDORSEMENTS    to   Absolute Title Services, Inc | | 115.00 | |
| 1112. | DOC PROCESSING FEE    to   Absolute Title Services, Inc | | 148.00 | |
| 1113. | INCOMING WIRE FEE    to   Absolute Title Services, Inc | | 20.00 | |
| 1114. | CONTRACT CLOSER FEE    to   ACCORD CORP    POC 200.00 | | | |
| 1115. | OFFSITE RENTAL    to   AVD CONSULTING    POC 75.00 | | | |
| 1116. | OVERNIGHT CUSTOMER FUNDS to   Absolute Title Services, Inc | | 20.00 | |
| 1117. | | | | |
| 1118. | | | | |
| 1119. | | | | |
| 1120. | | | | |
| 1200. | Government recording and transfer charges | | | |
| 1201. | Recording fees:    Deed $26.50  Mortgage $70.50 | | 97.00 | |
| 1202. | City/county tax/stamps: | | | |
| 1203. | State tax/stamps: | | | |
| 1204. | | | | |
| 1205. | | | | |
| 1206. | ILLINOIS RECORDING MANDATE to   Absolute Title Services, Inc | | 10.00 | |
| 1300. | Additional settlement charges | | | |
| 1301. | Survey | | | |
| 1302. | Pest inspection | | | |
| 1303. | PAY AS DIRECTED    to   CATHERINE/TAPE REPORT | | 1,127.00 | |
| 1304. | PAY AS DIRECTED    to   COLLECTION CO | | 1,009.00 | |
| 1305. | POLICY REGISTRATION    to   THE STATE OF ILLINOIS | | 3.00 | |
| 1306. | PAY AS DIRECTED    to   CREDIT PROTECTION ASSOC | | 323.00 | |
| 1307. | PAY AS DIRECTED    to   RISK MANAGEMENTALT | | 138.00 | |
| 1308. | PAY AS DIRECTED    to   RISK MANAGEMENT | | 113.00 | |
| 1400. | Total settlement charges (entered on lines 103, section J and 502, section K) | | 9,970.48 | |

ANNA R. RICHARDSON

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction

Absolute Title Services, Inc                                              Date    10/24/08

**SELLER'S AND/OR PURCHASER'S STATEMENT** Seller's and Purchaser's signature hereon acknowledges his/their approval of tax prorations and signifies their understanding that prorations were based on taxes for the preceding year, or estimates for the current year, and in the event of any change for the current year, all necessary adjustments must be made between Seller and Purchaser; likewise any default in delinquent taxes will be reimbursed to Title Company by the Seller.

Title Company, in its capacity as Escrow Agent, is and has been authorized to deposit all funds it receives in this transaction in any financial institution, whether affiliated or not. Such financial institution may provide Title Company computer accounting and audit services directly or through a separate entity which, if affiliated with Title Company, may charge the financial institution reasonable and proper compensation therefore and retain any profits therefrom. Any escrow fees paid by any party involved in this transaction shall only be for checkwriting and input to the computers, but not for aforesaid accounting and audit services. Title Company shall not be liable for any interest or other charges on the earnest money and shall be under no duty to invest or reinvest funds held by it at any time. Sellers and Purchasers hereby acknowledge and consent to the deposit of the escrow money in financial institutions with which Title Company has or may have other banking relationships and further consent to the retention by Title Company and/or its affiliates of any and all benefits (including advantageous interest rates on loans) Title Company and/or its affiliates may receive from such financial institutions by reason of their maintenance of said escrow accounts.

The parties have read the above sentences, recognize that the recitations herein are material, agree to same, and recognize Title Company is relying on the same

Purchasers/Borrowers                                                      Sellers

ANNA R. RICHARDSON

**WARNING:** It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18: U.S. Code Section 1001 and Section 1010

# THE BROOKS LAW FIRM

### 15008 Woodlawn Avenue
### Floor One
### Dolton, Illinois 60419

## Lloyd J. Brooks, CPCU
**Attorney at Law**

(708) 841-8000 Telephone
(708) 841-8080 Facsimile
lloyd.brooks@thebrooksfirm.com
www.thebrooksfirm.com

October 17, 2007

**VIA CERTIFIED MAIL**
Fremont Investment & Loan
P.O. Box 19041
San Bernandino, California 92423-9041

**VIA CERTIFIED MAIL**
Mortgage Electronic Registration Systems
1595 Spring Hill Road
Vienna, Virginia 22182

Re:   Notice of Rescission and Lien
      Anna R. Richardson
      1647 S. Central Park Avenue, Chicago, Illinois 60623
      Fremont Loan No.:   5000182867 or 925000182867
      MERS MIN:   1001944-5000182867-3

To The Interested Parties Addressed Above:

Please be advised that this office has been retained on behalf of the above client to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

It appears that on October 24, 2005 Fremont Investment & Loan closed a mortgage loan to Anna R. Richardson, a disabled and elderly person. The closing of the loan took place in her home and was closed by either her loan officer or contractor. The purpose of the loan was to pay for some repairs and remodeling of Mrs. Richardson's home. However, the closer of the loan never gave Mrs. Richardson copies of any of the documentation or disclosures presented at the closing. In addition the proceeds of the loan were never paid to Mrs. Richardson.

You are hereby notified that Mrs. Richardson elects to cancel the loan of October 24, 2005 for failure to comply with the Truth in Lending Act and its implementing regulations, Regulation Z. Pursuant to 15 U.S.C. §1641, demand is made for the identity of the owner of this note and mortgage. Pursuant to 12 U.S.C. §2605, I request an account history and a copy of all documents allegedly signed by my client at the closing. I am requesting this documentation so that I may determine what, if anything, my client is obligated to repay.

Faithfully yours,

THE BROOKS LAW FIRM

Lloyd J. Brooks

# Exhibit B

# THE BROOKS LAW FIRM

Notice of Rescission and Lien
Anna R. Richardson
1647 S. Central Park Avenue, Chicago, Illinois 60623
Fremont Loan No.:    5000182867 or 925000182867
MERS MIN:   1001944-5000182867-3
October 17, 2007
Page 2

CC:    Arlene Y. Coleman., Esq.


I, Lloyd Brooks, under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document sent to the addresses for each entity addressed above via U.S. mails as indicated above each addressee on October 17, 2007.


_____
Lloyd Brooks