IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **CHARLOTTE HORTON**, as guardian of the estate of Anna R. Richardson, adjudicated disable person, <br><br> Plaintiff, <br><br> v. <br><br> **COUNTRY MORTGAGE SERVICES, INC.**; an Illinois corporation; **FREMONT INVESTMENT & LOAN**, a California corporation; and, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**, a Delaware corporation. <br><br> Defendants. | 07 c 6530 <br><br> Judge Lindberg <br><br> Magistrate Judge Nolan |

## FIRST AMENDED COMPLAINT

Now Comes CHARLOTTE HORTON, as guardian of the estate of Anna R. Richardson, by and through her attorney Lloyd Brooks, to complain against the defendants as follows:

### Nature of the Action

1.     This action is brought by the guardian of Anna R. Richardson seeking rescission of a mortgage loan made to Anna while she suffered from dementia. The loan officer closed the loan in Anna's home however failed to leave her with any documentation of the loan including notices and disclosures required to be provided to Anna by the federal Truth In Lending Act. The violation of TILA gave rise to a statutory right for Anna to rescind the subject loan. Additionally, the mortgage broker and lender engaged in a kickback scheme where the mortgage broker was given a referral fee for arranging the loan to Anna in violation of the Real Estate Settlement Procedure Act and the Illinois Consumer Fraud Act.

**Parties**

2. **Charlotte Horton** is the plaintiff in her capacity as guardian of the estate of Anna R. Richardson. Horton was appointed as guardian for Anna R. Richardson in an action styled In Re Estate of Anna R. Richardson, 06 P 527 in the Circuit Court of Cook County, Probate Division.

3. **Country Mortgage Services, Inc.**, ("CMS") is an Illinois corporation and is the business or procuring mortgage for its customers as a mortgage broker. CMS arranged for the mortgage that is the subject of this action.

4. **Fremont Investment & Loan Company** ("Fremont") is a California corporation with its principal offices located in Brea, California and does business in Illinois. Fremont originates loans to consumers to be secured by the consumer's principal residence by a mortgage. Fremont has originated more than 25 such transactions in the calendar year preceding the subject loan.

5. **Mortgage Electronic Registration Systems, Inc.** ("MERS") is a Delaware corporation with its principal place of business located in Vienna, Virgina. MERS acts as the nominee and holder of mortgages on behalf of mortgage lenders and other holders of monetary obligations secured by real estate, including real estate located in Illinois and within this judicial district. MERS, as the nominee of Fremont, is the holder of the Mortgage that is the subject of the present action.

**Jurisdiction and Venue**

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 as this action arises under the laws of the United States. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367 as the claims

are so related to Plaintiff's federal law claims that they form part of the same case and controversy.

7. This Court has jurisdiction over the defendants who are all doing business in this State and have availed themselves of this State's benefits and protections.

8. Venue is proper in this Court as defendants reside within this judicial district and a substantial portion of the events giving rise to this action occurred within this judicial district.

## Facts Common To Each Cause Of Action

9. Anna Richardson is an elderly woman born October 2, 1912. Richardson is the owner of a two unit building located at 1647 S. Central Park Avenue in Chicago, Illinois and has been for nearly 50 years.

10. In March of 2003 Anna refinanced her mortgage on the property by taking out a loan with Bank One in the amount of $25,800. The loan was serviced by Chase Home Finance.

11. Anna developed dementia beginning by at least 2004 and it developed into a form of severe dementia before October of 2005.

12. Due to Anna's failing medical condition, Horton became Anna's power of attorney and handled all of her financial affairs including the payment of her monthly mortgage payments to Chase.

13. In October of 2005 a general contractor named JD Homes, Inc. contacted Anna, without Horton's consent or knowledge, and convinced her to allow the company to perform some work on the property.

14. The general contractor informed Anna that the company would arrange for financing of the work. Shortly thereafter Anna was contacted by a loan officer employed by CMS.

15. On October 24, 2005 the loan officer visited Anna at her home and brought to her numerous documents in connection with closing the loan that was to pay of the home remodeling.

16. The loan officer did not explain any of the documents to Anna, nor could Anna read or understand the documents she was given.

17. The loan officer instructed Anna to sign the documents and Anna complied.

18. After the Anna completed signing the documents the loan officer left with them and did not leave any copies for Anna's records.

19. On information and belief, the contractors were given two checks from the proceeds of the loan totaling over $100,000 by the title company or the loan officer.

20. The contractor returned to Anna's home, but only performed a minimal amount of work, not worth anywhere near the over $100,000 in proceeds it received.

21. Subsequently, Chase sent notification to Horton that its loan had been paid off. Horton, unaware of the recent events, contacted Chase to inquire about the source of the payoff funds.

22. Horton became informed that a new loan for $150,000 had been secured by Anna's home.

23. Horton inquired of Anna regarding the loan, and Anna denied ever taking out a loan. Anna's failure to remember taking out a loan was due to her unstable mental capacity arising from her dementia.

24. Horton sought legal assistance to open guardianship proceedings to assist Anna. Horton was appointed as the guardian of Anna's estate on June 7, 2006.

25. In the meantime, Horton's guardianship counsel assisted Horton in obtaining information regarding the subject loan. In an attempt to obtain information regarding the loan, Charlotte's attorney contacted CMS and caused subpoenas to be issued to CMS for production of documents relating to the transaction. Despite the issuance of subpoenas and rules to show cause, CMS failed to produce any documents regarding the transaction.

26. Finally, on or about August 14, 2007 counsel for CMS forwarded certain documents related to the loan to counsel for Horton. Some of the documentation obtained included a Settlement Statement for the loan indicating the accounting for the loan proceeds and that the lender was Fremont. A copy of the Settlement Statement is attached at Exhibit A.

27. The Settlement Statement reveals that the principal loan amount was $150,000; the loan proceeds were $104,388.38; and the total fees paid to CMS were $5,560.50.

**Count I**
**Violation of Truth In Lending Act**
**(Against Fremont and MERS)**

28. Plaintiff realleges paragraphs 1 to 27 as though they were fully realleged herein.

29. The loan made to Anna was for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes and to pay for remodeling of the home.

30. At the closing of the loan Anna was requested to sign a Mortgage to convey a security interest in her home to MERS, as the nominee of Fremont.

31. Because this transaction was secured by Anna's home and was not entered into for purposes of its initial purchase or construction, the loan was made subject to Anna's rescission rights under the Truth In Lending Act, 15 U.S.C. §1635, and implementing Federal Reserve Board Regulation Z, 12 C.F.R. Part 226.

32. Regulation Z reads in pertinent part:

§226.23

(a) *Consumer's right to rescind.*

    (1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.

    (2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

    (3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures, whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act.

(b) *Notice of right to rescind*:

    (1) In a transaction subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered by electronic communication as provided in section 226.36(b)). The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

        (i) The retention or acquisition of a security interest in the consumer's principal dwelling.

        (ii) The consumer's right to rescind the transaction.

    (iii)    How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

    (iv)    The effects of rescission, as described in paragraph (d) of this section.

    (v)    The date the rescission period expires.

**(d)** *Effects of rescission.*

    (1)    When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

    (2)    Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

    (3)    If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph (d)(2) of this section. When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's designated place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.

33.    TILA provides in pertinent part:

12 U.S.C.§1640

Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title, or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—

(1) any actual damage sustained by such person as a result of the failure;

(2)(A) (iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2,000;

(3) in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court.

34.    Anna was not provided with any copies of a Notice of Right to Cancel or a Truth In Lending Statement in violation of her TILA rights pursuant to 15 U.S.C. §1635 and Regulation Z, §226.23(b).

35.    The failure to provide Anna with proper notice of her right to cancel or a Truth In Lending Disclosure Statement gives rise to an extended right to rescind the subject transaction.

36. An election was made by Charlotte, on behalf of Anna, to rescind the subject loan. See Exhibit B.

37. Since the time of the election to rescind neither Fremont nor MERS has contacted Charlotte or her counsel concerning the rescission of the loan.

WHEREFORE CHARLOTTE HORTON, on behalf of Anna R. Richardson, respectfully request that the Court enter judgment in Anna's favor and against FREMONT INVESTMENT & LOAN COMPANY and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. for a judgment, capable of recordation in public records, voiding the subject mortgage; statutory damages for the underlying failure to provide Anna with the proper disclosures and notice of her right to cancel the transaction; statutory damages for the failure to honor the election to rescind the loan; an order requiring deletion of all adverse credit information relating to the loan; an award of his attorney's fees and costs of this action; and, such other relief as this Court deems just and appropriate.

### Count II
### Rescission of Note and Mortgage
### (Against Fremont, MERS)

38. Plaintiff realleges paragraphs 1 to 27 as though they were fully realleged herein.

39. At the time that Anna executed the documents provided to her by the loan officer she was diagnosed with dementia.

40. Dementia is an acquired loss of cognitive function that affects language, attention, memory, personality and abstract reasoning.

41. Due to Anna's dementia she was unable to form the requisite state of mind to enter into an agreement with Fremont to borrow any funds.

42.     Anna is not responsible to pay to either Fremont, MERS, or their successors any amounts that were not received by her, including the amounts that the contractor received and did not use to perform any work on her behalf.

43.     Anna has already tendered sufficient funds to Fremont to extinguish the amount of debt that she may owe under the subject loan.

WHEREFORE Plaintiff respectfully requests this Court grant the relief of declaration that the loan transaction with Fremont Investment & Loan Company is void; the neither Fremont nor Mortgage Electronic Registration Systems, Inc. have any further interest in the subject property resulting from the mortgage conveyed to MERS; and award Anna any other relief this Court may find just and reasonable.

**Count III**
**Violation of RESPA's Antikickback Provisions**
**(Against Fremont and Country Mortgage)**

44.     Plaintiff realleges paragraphs 1 to 27 as though they were fully realleged herein.

45.     Fremont's operations are made profitable through the receipt of fees and interest payments on loans that it originates as well as the selling of its loans on the secondary mortgage market.

46.     When selling loans on the secondary market, Fremont is able to command a higher selling price for loans with higher stated interest rates and other terms that are lender friendly.

47.     Fremont originates its loans by associating with mortgage brokers. Fremont provides mortgage brokers with "rate sheets" or similar documents that provide the mortgage broker with information regarding Fremont's loan programs including the interest rates it would charge qualified borrowers called "par rates".

48. In an effort to increase its profits through higher interest payments from its borrowers and higher selling prices for the loans it sells, Fremont encourages mortgage brokers to arrange for loans to borrowers with higher than "par rate" interest rates.

49. Fremont encourages the mortgage brokers to arrange for these higher than "par rate" loans by offering the mortgage broker a portion of the up charged interest rate called a "yield spread premium." The higher the up charged interest rate the higher the yield spread premium paid to the mortgage broker.

50. CMS is a mortgage broker. As a mortgage broker, CMS arranges for loans for its customers by contacting direct lenders, such as Fremont, to originate loans to CMS's customers.

51. CMS makes a profit by charging fees directly to its customers such as loan application fees, underwriting fees, loan origination fees, etc.

52. CMS also enters into agreements with the direct lenders, including Fremont, whereby CMS accepts yield spread premiums on each loan made and other bonuses such as volume based compensation, which are paid based upon the volume of loans arranged by CMS to the lender during a period of time.

53. Aware that no reasonable borrower would agree to pay a higher interest rate, without any benefit in return, CMS does not reveal to its customers that they are paying higher than "par rate" interest rates. CMS does not reveal to its customers that they qualify for lower interest rates. CMS does not reveal that they are being paid a yield spread premium or why they are being paid a yield spread premium.

54. Fremont is aware that its mortgage brokers, including CMS, do not reveal the nature or purpose of the yield spread premium that the mortgage broker is receiving

and that mortgage brokers, including CMS, induce borrowers to enter into loan agreements with Fremont by using fraud and deceit, including misrepresentations and concealment of material facts regarding the existence, nature, and purpose of the yield spread premium and the increased interest rate the borrower is paying.

55. CMS procured a mortgage loan for Anna totaling $150,000.

56. CMS was paid a broker fee in the amount of $2,780.00, a processing fee of $495.00, and a yield spread premium in the amount of $2,250.00, a credit report fee of $10.50, and a courier fee of $25.00.

57. Unbeknownst to Anna, Fremont and CMS had previously entered into the above described scheme whereby CMS would refer uncharged interest rate loan business to Fremont in exchange for Fremont providing CMS with a yield spread premium for such referrals.

58. CMS in fact referred the loan application for Anna to Fremont and CMS received a yield spread premium of $2,250.00 from Fremont in addition to the $3,310.50 in loan fees, in connection with the subject transaction.

59. As described above, the payment of the yield spread premium is a kickback from Fremont to CMS for the referral of business and also for the agreement to increase the interest rate on the borrower above that which the borrower might otherwise qualify for.

60. CMS and Fremont did not disclose that Anna qualified for an interest rate lower than the one she was charged for the subject loans.

61.     CMS and Fremont did not disclose to Anna that CMS was going to receive additional compensation outside of closing by having Plaintiff agree to pay a higher than necessary interest rate for the loans.

62.     CMS and Fremont did not disclose to Anna that they had entered into a scheme involving the exchange of loan referrals for the payment of yield spread premiums.

63.     The Department of Housing and Urban Development (HUD) has issued policy statements providing guidelines for compensable services provided by mortgage brokers in connection with the origination of a mortgage loan.  Those compensable services include:

    (a)     Taking information from the borrower and filling out the application;

    (b)     Analyzing the prospective borrower's income and debt and prequalifying the prospective borrower to determine the maximum mortgage that the prospective borrower can afford;

    (c)     Educating the prospective borrower in the home buying and financing process, advising the borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments could vary under each product;

    (d)     Collecting financial information (tax returns, bank statements) and other related documents that are part of the application process;

    (e)     Initiating/ordering VOEs (verifications of employment) and VODs (verifications of deposit);

    (f)     Initiating/ordering requests for mortgage and other loan verifications;

    (g)     Initiating/ordering appraisals;

    (h)     Initiating/ordering inspections or engineering reports;

    (i)     Providing disclosures (truth in lending, good faith estimate, others) to the borrower;

    (j)     Assisting the borrower in understanding and clearing credit problems;

 (k) Maintaining regular contact with the borrower, realtors, lender, between application and closing to appraise them of the status of the application and gather any additional information as needed;

 (l) Ordering legal documents;

 (m) Determining whether the property was located in a flood zone or ordering such service; and

 (n) Participating in the loan closing.

 64. In connection with Anna's loan CMS did not perform any of the HUD recognized services, other than the loan officer participated in the closing.

 65. To the extent that CMS provided any compensable service, the market value for those services were not worth in excess of $5,560.50, which CMS received in connection with Anna's loan.

 66. The amount of total compensation paid to CMS did not reasonably relate to the value of the services provided by CMS and is in excess of what other mortgage brokers in a similar transaction would be paid.

 67. The Real Estate Settlement Practices Act provides in pertinent part:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person. 12 U.S.C. 2607(a).

 68. Fremont agreed to pay and CMS agreed to accept a fee that was in excess of any amount CMS reasonably should receive for its services

 69. The amount Fremont paid was to compensate CMS for referring the loan.

 70. Such a payment is in violation of RESPA's bar against referral fees.

 71. Section 2607(d)(2) of RESPA reads in pertinent part:

> Any person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

72. In addition Section 2607(d)(5) of RESPA allows a successful plaintiff the recovery of their reasonable attorney's fees and litigation costs.

WHEREFORE CHARLOTTE HORTON, on behalf of Anna R. Richardson, request this Court enter judgment in Anna's favor and against FREMONT INVESTMENT & LOAN COMPANY and COUNTRY MORTGAGE SERVICES, INC. in an amount of three times the unlawful payment or $16,681.50, award her attorney's fees and costs of litigation, and other relief this Court finds reasonable and just.

### Count IV
### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act
### (Against Fremont and Country Mortgage)

73. Plaintiff realleges paragraphs 1 to 27 and 45 - 66 as though they were fully realleged herein.

74. The Illinois Consumer Fraud and Deceptive Business Practices Act reads in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

75. CMS:

   a) misrepresented to Anna the amounts of fees they would be charged in connection with the loans;

   b) failed to disclose to Anna that it had entered into a scheme with Fremont, whereby CMS would obtain additional compensation for referring loan business to Fremont;

   c) failed to disclose to Anna that they were paying a higher than market rate interest rate on the loans;

   d) failed to disclose to Anna that it was going to obtain a higher profit from the loans due to the increased interest rate; and

   e) charged a fee in connection with the loans well in excess of the reasonable market rate for the services they provided.

76. Fremont:

   a) entered into a scheme with CMS to refer Anna's loan;
   b) paid CMS a kickback in exchange for its loan referral;
   c) failed to disclose to Anna its participation in the scheme; and,
   d) failed to disclose to Anna that they qualified for a lower interest rate.

77. CMS and Fremont's conduct was unfair and deceptive to Anna and used in the course of their trade as a mortgage broker and lender.

78. CMS and Fremont acted with the intent that Anna rely upon their conduct in executing documents at the October 24, 2005 closing.

79. CMS and Fremont's practices have caused Anna substantial damages including the higher interest payments on the subject loans than would otherwise be required.

WHEREFORE CHARLOTTE HORTON, on behalf of Anna R. Richardson, prays upon this Court to enter a judgment in Anna's favor and against FREMONT INVESTMENT & LOAN COMPANY and COUNTRY MORTGAGE SERVICES, INC. and award her actual damages in an amount to be proven at trial, enjoin the defendants requiring them to disgorge any and all proceeds and profits received in the subject transaction, her attorney's fees, costs to bring this action, and other further relief as the Court deems equitable and proper.

                                      Respectfully Submitted,

State Bar No. 6271994
Lloyd Brooks                                    /S/ Lloyd Brooks
The Brooks Law Firm                       _____
15008 Woodlawn Avenue                 Attorney for Plaintiff
Dolton, Illinois 60419
(708) 841-8000 Telephone
(70*) 841-8080 Facsimile
E-mail: lloyd.brooks@thebrooksfirm.com
**Attorney for Plaintiff**